**ORDWAY–SAUNDERS COMPANY, Appellant,**

v.

**Dawson LITTLE, Appellee.**

**No. 8891.**

Court of Civil Appeals of Texas, Amarillo.

June 26, 1978.

Rehearing Denied July 24, 1978.

Gibson, Ochsner, Adkins, Harlan & Hankins, S. Tom Morris, Amarillo, for appellant.

Carson Smith & Associates, Amarillo, Miller, Gann & Perdue, Ralph K. Miller and Jim M. Perdue, Houston, for appellee.

REYNOLDS, Justice.

After Dawson Little withdrew as a partner from Ordway-Saunders Company and accepted payment computed under the partnership agreement for his partnership interest, he brought this action to recover additional sums for his share of partnership assets not included in the computation. Judgment was rendered decreeing his recovery of stipulated sums and the jury-found sum which were not included in the computation. We hold that the partnership

agreement precluded the surcharges. Reversed and rendered.

Ordway-Saunders Company is, and for many years has been, a partnership engaged in the general insurance and mortgage banking business in Amarillo. From time to time, the partnership has been composed of different partners.

Dawson Little was employed by the partnership in 1959 as a solicitor. On 1 January 1960, he became a partner with the purchase of two separate interests aggregating a seven and one-half (7.5%) per cent interest in the partnership. By a later purchase and contributions connected with changes in the partnership status and personnel, his partnership interest became fixed at seventeen and nineteen one hundredths (17.19%) per cent.

To record a more complete understanding of the partnership, the partners executed an agreement on 15 May 1965. Among its provisions were expressions that "[t]he books of the partnership shall be kept on the accrual method of accounting," that "[t]he assets and liabilities of the partnership and the capital accounts of the partners are shown on the books of the partnership and made a part hereof for all purposes," and that "[f]ull and accurate accounts of all transactions of the partnership shall be kept in proper books of account." Provided for also were the other active partners' purchases of the interests of active partners who elected to become consulting partners, who died or who were voted early retirement.[1]

---

1. One electing to become a consulting partner would would receive for his interest "forty (40%) per cent of such consulting partner's capital account as of the close of the month preceding such election" in cash, sixty (60%) per cent of both the monthly salary then being paid and the profits attributable to his share immediately before his election for fifty (50) months, and, at the end of the fiftieth month, "the amount remaining in such partner's capital account" in cash. Any amount unpaid at the consulting partner's death is to be paid under the same timetable to his estate.

The interest of a deceased active partner is to be purchased from his estate for "the amount of such partner's capital account as of the end of the month preceding his death." In addi-

tion, the estate is to continue as a member of the partnership for a period of fifty (50) months at a reduced interest, receiving sixty (60%) per cent of both the monthly salary then being paid and the profits attributable to the deceased partner's share immediately before his death.

Partners holding a sixty (60%) per cent interest in the partnership can vote an early retirement for an active partner. For "all of the retired partner's interest in the partnership assets," he is to receive, in cash, "an amount equal to the retired partner's capital account at the time the partners so vote." Additionally, he is to receive, in twelve (12) equal monthly installments, "an amount equal to one-third ($\frac{1}{3}$) of the amount of the profits and losses which said partner drew the preceding 36-month period."

Thereafter, amendments to the basic agreement were made with each change of partnership personnel. On 30 June 1974, there was executed by the partners the seventh amendment which, together with the 15 May 1965 basic agreement, constitutes the entire partnership agreement giving rise to this litigation. Paragraph 5 of the seventh amendment, which was incorporated after Little asked that there be added another alternative by which the partners could voluntarily withdraw, reads, in part:

5. An active Partner may voluntarily withdraw from the Partnership by giving written notice thereof to the other active Partners. Upon withdrawing, all the withdrawing Partner's interest in the assets, records, business and all other property of the Partnership shall become the property of the Partnership composed of those persons who are Partners other than the withdrawing Partner, and the withdrawing Partner shall receive therefor either

(a) If the withdrawing Partner has been an active Partner of Ordway-Saunders Company for a period of at least three (3) years and enters into an agreement not to compete in the insurance and mortgage loan business with the Ordway-Saunders Company Partnership or any of the members of Ordway-Saunders Company Partnership . . . the withdrawing Partner shall receive for a period of thirty-six (36) months after electing to withdraw fifty percent (50%) of the share of the profits he was receiving immediately prior to his election, and fifty percent (50%) of the salary being drawn by each Partner during the thirty-six (36) month period. These amounts shall be paid by the Partnership to the withdrawing Partner out of the income of the Partnership. In addition, the other active Partners shall pay the withdrawing Partner fifty percent (50%) of his capital account at the time of his election to withdraw and the balance remaining in his capital account at the end of the thirty-six (36) month period,

OR

(b) If the withdrawing Partner does not enter into an agreement not to compete or he has not been a Partner of the Ordway-Saunders Company Partnership for a period of at least three (3) years prior to his election to withdraw, the Partnership shall pay the withdrawing Partner an amount equal to, and the withdrawing Partner shall sell and the remaining active Partners shall purchase for cash for an amount equal to the retiring Partner's capital account at the time of his election to withdraw. In addition to the above, the Partnership shall pay out of the Partnership income an amount equal to one-third (⅓) of the amount of profits and losses which said Partner drew during the immediately preceding thirty-six (36) month period, and one-third (⅓) of the Partnership salary which he received during the immediately preceding thirty-six (36) month period. These payments will be made in twelve (12) equal monthly installments with the first installment being payable thirty (30) days after withdrawal and a like installment to be made on the same day of each month thereafter until the twelve (12) monthly payments have been made.

A letter dated 11 February 1975, signed by Little and addressed to the other partners contains this language:

I, an active partner of the Ordway-Saunders Company, a partnership, hereby give you written notice of my withdrawal under Part 5 of Amendment Number Seven to the Ordway-Saunders Company, a Partnership, Agreement dated June 30, 1974.

I have been an active partner for a period in excess of three (3) years but do not wish to enter into an agreement not to compete in the insurance and mortgage loan business with the Ordway-Saunders Company, a partnership, or any of the members of Ordway-Saunders

Company. My withdrawal date shall be the *1st* day of *March*, 1975.[2]

I realize that I have assigned all amounts due me upon withdrawal from the partnership to the Amarillo National Bank, Amarillo, Texas, as security for its loan to me. I agree that all checks in payment of the amounts due me shall be payable to J. Dawson Little and Amarillo National Bank, Amarillo, Texas, and delivered to the Amarillo National Bank.

Little was furnished a calculation made from the partnership's books of the amount of his capital account and the total amount of payment he would be entitled to under paragraph 5(b) of the amended partnership agreement. It was later stipulated, without prejudice to Little's contention that assets were omitted in computing his capital account, that the figures of $30,758.04, as the amount of Little's capital account, and $78,061.58, as one-third of Little's net income and salary for the thirty-six months prior to the date of his withdrawal, were accurately taken from the partnership's books and calculated in accordance with the formula set forth in paragraph 5(b). After consulting with his attorney and an accountant, Little was paid and he accepted the total sum of $108,819.62 in the scheduled periodic payments.

After receipt of the $108,819.62, Little began this action on 21 May 1976. As material to the appeal, he declared on the partnership agreement, alleging that the amounts due him thereunder were not adequately determined and distributed to him in that (1) the fair market value of some realty owned by the partnership was not utilized, (2) the retained earnings of a corporation wholly owned by the partnership were not credited, and (3) the good will attached to the partnership was disregarded in determining his capital. His action is to surcharge the agreement for his share of these assets.

The partnership defended. For its main defense, the partnership interposed the integrity of the partnership agreement under which, the partnership answered, Little was paid the full contractual consideration for his partnership interest.

Neither party pleaded any fraud, accident or mistake in formulating the agreement or any ambiguity in its terms. No party pleaded that the court should seek an intent not clearly expressed in the partnership agreement. Hence, the pleadings place the parties in these diverse positions: Little contends that, although the figures furnished and the amounts paid to him were correct according to the partnership's books, his capital account did not reflect, and he was not paid, his full share of the partnership assets pursuant to the partnership agreement; the partnership contends that the partnership agreement states the formula for payment based on book values that contractually are not subject to adjustment for settlement, and that Little was paid the full amount under the agreement.

During the jury trial it was, and it here is, undisputed that the realty, consisting of lots in the Oakdale Addition of Amarillo, and the stock in the corporation, the O&S Corporation, always were carried on the partnership's books and included in the partners' capital accounts at cost. Any net profits of the corporation were distributed to the partnership at the end of each year. No adjustments were made on the books for fluctuations in the market value of either the realty or the corporation stock. It is stipulated that if Little is entitled to an adjustment based on the market value of the realty and on the retained earnings of the corporation at the date of his withdrawal, his interest therein would be $5,037.09 and $4,067.24, respectively.

Further undisputed is that no value for good will ever was entered on the partnership's books or brought into the partners' capital accounts. No payment for good will

---

2. Little alleged in his live trial pleadings, and secured a jury finding, that he was forced to retire from the partnership; yet, he made no claim for payment, or adjustment, under the forced retirement provision of the basic agreement, which would have been for a lesser amount than prescribed under the invoked paragraph 5(b) of the seventh amendment. No issue regarding this matter has been raised on appeal, and it is not further noticed.

was ever made by incoming or to outgoing partners during the existence of the partnership. During the time Little was an active partner, one of the founding partners elected to become a consulting partner, one partner died, one partner withdrew, and three new partners were admitted, and no payments or adjustments were made for good will.

Although Little acknowledged that he had free access to the books and on a regular basis was furnished a computer printout of a balance sheet and operating statement, he said that he did not know how the books were kept and no accounting ever was made to him. He stated that before he accepted any payments, he questioned the figures, but that he did not know about the omission of the market value, retained earnings and good will until the partnership's books were audited by his accountant during August through October of 1975. However, the following was elicited on Little's cross-examination:

Q. You have been paid the amount of your capital account as set forth on this schedule?

A. Right.

Q. And you have been paid your share of the earnings averaged on the three-year basis as set forth on this document?

A. According to those figures, yes.

Q. And you were paid all of those items after you had consulted counsel and after you had consulted your own accountant, were you not?

A. Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Now, after you consulted a lawyer and accountant, you knew that the market value of the Oakdale Lots was not included in the accounting that was submitted to you, didn't you?

A. Yes.

Q. You knew that only the cost of those lots was included?

A. That's right.

Q. You knew that the retained earnings in O&S Corporation had not been brought into the Ordway-Saunders Company balance sheet, did you not?

A. I assumed that they hadn't. These figures didn't . . .

Q. I'm saying after you had consulted your lawyer and after you had consulted your accountant, you knew that, didn't you?

A. Yes.

Q. Okay. And you knew that the good will of Ordway-Saunders Company had not been computed as an item or no value had been placed on that for purposes of determining the amount that you were to be paid?

A. That's right.

Q. You knew that. Now, with knowledge of all those things, you continued to receive the monthly payments as provided for under Paragraph 5–B of Amendment No. 7?

A. Yeah, I was forced to.

Q. You continued to do that and collected them each and every month for 12 months until the entire amount was paid to you?

A. I was forced to, yes.

Q. Well, I'm not asking you that.

A. Well, that's the answer to it.

MR. MORRIS: I move that be stricken, Your Honor.

THE COURT: Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Did you continue to receive those payments until the full amount was paid?

A. I received them, yes.

Q. And you did that after you had knowledge that these factors you're complaining about had not been included?

A. Yes.

Q. All right. Your answer is "yes"?

A. Now, restate the question, please.

Q. I say you did that, you received those payments after you had knowledge that each of these four things you're complaining about had not been included in the amount of money to be paid to you?

A. Yes, sir.

Little explained that by being forced to receive the payments he thought it was the honorable thing to do so that his bank note

would be paid off to keep the guarantors from having to pay it, although it was shown that his guarantors had been released and, in lieu, there was an assignment of Little's partnership income to the bank.

Mike Turner, an Amarillo certified public accountant, made a limited review of the partnership's records at Little's request to determine the validity of the procedures used in arriving at the amount of money Little was paid. It was his opinion that the books were not kept as provided in the partnership agreement. The deficiencies he noted were that: the earnings of the corporation had never been reflected in the partnership's books which, under generally accepted accounting principles, would increase the partners' capital accounts; and there was an immaterial accounting error in reporting that some of the real estate lots were owned by the corporation rather than by the partnership, which would have made an immaterial difference in the amount of dollars, but should have been included in the partners' capital accounts. He felt that there existed good will, which had never been carried as an asset of the business, had never been taken into account in computing the capital account of any of the partners, and had not been reflected in Little's capital account at the time of his withdrawal.

Raymond J. Clay, a professor of accounting at Texas Tech University and a certified public accountant who has examined accounting records to determine the existence of good will in different businesses, gave testimony bearing on the existence and value of good will in the partnership. Asked to define good will, Clay responded that it "concerns an entity's ability to earn an above average rate of return, above average being more than what other businesses within the same industry would earn."

Good will, according to Clay, is a "going concern concept," an asset which, under generally accepted accounting principles, is not recorded in the records at any time prior to the change in ownership or sale of the business entity unless a particular amount of money is attributed to it when a going concern is purchased. It was his opinion that the admission of good will into the records at the time a partner withdraws would be in accordance with generally accepted accounting principles and the partnership agreement provision that the books be kept on an accrual method of accounting. He opined that good will would have to be recorded for a fair and equitable accounting for an equitable settlement to be made for a departing partner; however, he assented to the statement that whether good will should be shown as a capital item depends upon the agreement between the partners.

It was Clay's opinion that the Ordway-Saunders Company partnership does possess good will. To arrive at his opinion of the value of the good will, he considered the partnership's average annual income of $867,945.50 for the three years 1972–74 and applied a formula of one and a half times that annual average to arrive at a value of $1,301,918.20. The formula applied was taken from the guidelines published by National Underwriters, Inc., a service bureau, which, in Clay's words, "indicate that the value of an insurance business is somewhere between one and three times the average annual commissions of that business, the rule of thumb being one and a half times the average annual income or commissions." Specifically, Clay testified that:

> One and a half times that annual average would give us a value of $1,301,918.20 as the valuation of this particular entity.

> Now, this is a conservative approach based on the National Underwriters survey. But that would be equivalent to the value of Ordway-Saunders if we were selling it at one and a half times the average annual commissions.

> *  *  *  *  *  *

> Oh, there's no question that getting into such things as the public patronage, the fact that this particular company enjoys a contract, an exclusive right with a national organization—and I believe it's the Hartford Company—would give us an indication that perhaps even more than one and a half times may be justifiable in this case.

Admitted over the partnership's objection of lack of materiality and relevance was a copy of the agreement for the 1971 sale of Ordway-Saunders Company of Dallas, a separate partnership composed of the Ordway-Saunders Company partners. Listed among the assets sold for which no monetary value was individually assigned was the good will of the partnership.

Its motion for an instructed verdict being denied, the partnership presented among its witnesses Douglas N. Perkins, a certified public accountant who is an associate of the accounting firm responsible for the accounting aspects of the partnership's business. He confirmed that good will has never been carried on the books and that no adjustment has ever been made in the capital accounts because of good will consideration when there was a change of partners. He testified that the only time good will is treated as an asset under generally accepted accounting principles is when a purchaser and a seller agree to assign a certain value to it.

Perkins explained that the accrual basis of accounting would be an accrual of accounts receivable and an accrual of accounts payable. The generally accepted basis for reporting a physical asset, according to him, is to enter its cost on the books; to write it up to reflect something other than cost—e. g., an appraisal—is not a basis for, and would be contrary to, generally accepted accounting principles.

Overruling the partnership's motion for an instructed verdict, the trial court, over the partnership's objections to its charge, submitted special issues to the jury. The jury, finding that the partnership did have a good will value over and above the value of its tangible assets on February 28, 1975, fixed that value at $2,603,836.50. Parenthetically, it is observed that this $2,603,836.50 value is three times the partnership's average annual income of $867,945.50 for the three years 1972–74. The jury further found that when Little accepted the total sum of $108,819.62 it was without knowledge that such sum did not include any amount for the market value of the realty, or for the retained earnings in the corporation, or for the good will of the partnership.

The court accepted the verdict and overruled the partnership's motion to disregard the jury verdict and for judgment non obstante veredicto. A $456,703.82 judgment was rendered on the stipulations and the jury's verdict in favor of Little and against the partnership and the partners jointly and severally.

The partnership has appealed, utilizing eleven points of error. If essential to a decision, we would sustain the points by which the partnership avers that the evidence is factually insufficient to support the jury's finding of good will value, and that the jury's findings that Little accepted the sum of $108,819.62 without knowledge of the omissions are against the great weight and preponderance of the evidence.

Valuation of good will is a complex matter of fact. It may be based on expert testimony which, in turn, is usually grounded on various approximation formulas applied to earnings. *See, e. g., Taormina v. Culicchia*, 355 S.W.2d 569, 574 (Tex.Civ.App. —El Paso 1962, writ ref'd n. r. e.). But the value of good will is not the value of the business itself. Good will is an intangible which is an integral part of the business the same as are the physical assets. *Texas & P. Ry. Co. v. Mercer*, 127 Tex. 220, 90 S.W.2d 557, 560 (1936). It exists, therefore, as incidental to the business and, as a thing of value to an insurance agency, is an advantage or a benefit beyond the value of the capital stock, funds or property. *Rice v. Angell*, 73 Tex. 350, 11 S.W. 338, 339, 3 L.R.A. 769 (1889).

Here, Professor Clay, consistent with the just mentioned nature and valuation of good will, has reference good will· to the partnership's ability to earn an above average rate of return. However, the formula he applied to determine the value of the partnership's good will is not referenced to above average earnings, but, instead, is referenced to the value and sales price of the entire business itself. The formula the professor applied is one to indicate, in his own words, "the value of an insurance business,"

and "the valuation of this particular entity," which "would be equivalent to the value of Ordway-Saunders if we were selling it." While the good will of the partnership has value, that value is not, as found by the jury, the formula's maximum value or sales price of the partnership itself, a finding which the evidence is too weak to support.

The jury found that when Little "received and accepted in payment for his partnership interest the total sum of $108,-819.62," he had no knowledge "[t]hat such sum did not include·any amount for" the market value of the lots, the retained earnings in the corporation or good will. The unequivocal acknowledgment by Little that he received the payments after he knew that none of the amounts in controversy were included, even though he explained why he accepted the payments, evinces that the jury's findings to the contrary are against the great weight and preponderance of the evidence.

But these points are not essential to a decision because the one reasonable meaning of the partnership agreement precludes the surcharges Little would impose. The parties themselves do not suggest any ambiguity in the agreement; they simply disagree upon the proper construction to be given it. The proper construction is the one which ascertains and gives effect to the true intention of the parties. This requires an examination and consideration of the · entire agreement to harmonize and give effect to all of its provisions, *Universal C. I. T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158 (1951), as manifested by the terms employed in the light of the attending circumstances. *Banker v. Breaux*, 133 Tex. 183, 128 S.W.2d 23, 24 (1939).

The 15 May 1965 portion of the agreement has provisos that the partnership's books shall be kept on the accrual method of accounting and reflect a full and accurate account of all transactions; yet the same agreement specifies that the assets and liabilities of the partnership and the capital accounts of the partners are shown on the books and, as shown, are made a part of the agreement for all purposes. Even

though the cost, rather than the market value, of the realty and the corporation stock was carried on the books which did not show any value for good will, there is no patent inconsistency, for that method, as the undisputed evidence shows, is consistent with generally accepted accounting principles for a going business and was the unvarying accounting practice of the partnership. That in and of itself is of little import until a settlement is necessitated by a change in the status of an active partner.

In every event in which a partner ceases to be an active partner, the agreement is specific that all of his interest in the partnership—and in Little's situation, "all the withdrawing Partner's interest in the assets, records, business and all other property of the Partnership"—shall be purchased by the remaining active partners. The amount of payment for that interest is geared to the particular event causing the inactivity, but in every event the payment includes the amount of the partner's capital account which, by force of the partnership agreement, is the one shown on the partnership's books.

Little acknowledges that he received the amount shown for his capital account, but he argues that he is not thereby barred from receiving his share .of good will, an asset not recorded on the partnership's books. He submits that controlling in Texas is the case of *Taormina v. Culicchia*, 355 S.W.2d 569 (Tex.Civ.App.—El Paso 1962, writ ref'd n. r. e.), which recognizes a recovery for good will upon the dissolution of a partnership even though the partnership agreement did not expressly provide for it. We do not deem that case dispositive of the facts before us. Apparent from the opinion in *Taormina*, and particularly from its citation of 68 C.J.S. Partnership § 396, p. 910 *et seq.*, relative to the value of good will for purposes of settlement and accounting, is that the partnership agreement, which terminated the partnership by its own terms, had no provision for the distribution of the partnership assets upon termination, and the issue of good will was determined under principles applicable in the absence of a

definitive agreement. That, of course, is not the fact situation we review.

Before us is an agreement under which Little sold to the remaining active partners "all" of his "interest in the *assets*, records, business and all other property of the Partnership" for an amount computable from the figures shown by the partnership's books (emphasis added). That amount was paid and received. As an admitted asset, good will, as well as any other asset whose exact value was not shown on the books, was included in the sale. And, although not mentioned by name, the good will and other assets would be included in Little's sale of "all" of his "interest in . . . all other property of the Partnership." Thus, for the amount shown as his capital account by the books and his allocated share of profits and salary, which he received and stipulated was correct, Little sold all of his interest in all property of the partnership. Having received the full payment he was to receive under the agreement, Little could not thereafter demand another settlement against the partnership. *Davis v. McCarty*, 145 S.W.2d 287, 290 (Tex.Civ.App.—San Antonio 1940, writ ref'd).

It seems evident that the adoption of Little's position would impress on the partnership agreement a requirement for settlement at the appraised value of all assets and liabilities at the time of the withdrawal, a requirement that never was met either before or after the final agreement was committed to writing. That such was not the intent of the parties is aptly illustrated by the absence of procedures for that method of settlement and the presence of alternative and comprehensive settlement provisions which have been followed.

Moreover, there is nothing derogatory to the intent of the parties nor inequitable to them in the entire agreement as we have construed it, and the construction conforms to the interpretation the parties themselves placed on the language they used in the partnership agreement. The parties were competent to contract as to the settlement to be made when a partnership interest was terminated, and the provision Little invoked

for his settlement was inserted at his request. It is the same provision that was applied without the imposition of the surcharges Little now seeks for his benefit when an active partner withdrew while Little was a member of the partnership. The provision is reciprocal and, because it applies equally to all partners, the fact that at any given time their interests might be worth more or less than their capital accounts reflect does not give one of them the right to insist on a settlement different from the one that they all agreed upon.

Accordingly, the first two points by which the partnership asserts that Little is not entitled to further payment are sustained. A further discussion of the other points is thereby pretermitted.

The judgment of the trial court is reversed. Judgment is here rendered that Dawson Little take nothing by his action against the Ordway-Saunders Company partnership. Rule 434, Texas Rules of Civil Procedure.